IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOANNE M. MECKLEY | : | CIVIL ACTION NO. **3:CV-05-1031** |
| Plaintiff | : | (Judge Conner) |
| v. | : | (Magistrate Judge Blewitt) |
| JOANNE B. BARNHART, Commissioner of Social Security, | : | |
| Defendant | : | |

**REPORT AND RECOMMENDATION**

This is a Social Security disability case pursuant to 42 U.S.C. § 405(g), wherein the Plaintiff, Joanne M. Meckley, is seeking review of the decision of the Commissioner of Social Security (Commissioner) which denied her claim for disability insurance benefits (DIB) pursuant to Title II of the Social Security Act (Act), 42 U.S.C. §§ 401-33.

**I.  PROCEDURAL HISTORY.**

The Plaintiff protectively filed an application for DIB on August 14, 1998, alleging disability due to fibromyalgia, degenerative disc disease, and arthritis. (R. 26, 128). The Plaintiff also indicated in her application that she was seeing a psychiatrist for panic attacks. (R. 130). She alleged disability since November 25, 1996, her last day of work as a home health aide. (R. 20, 128, 576). The Plaintiff's claim was denied initially and she requested reconsideration. (R. 33). In her reconsideration report, the Plaintiff indicated that she was also suffering from depression. (R. 35, 145). On reconsideration, the state agency had the Plaintiff's claim reviewed by an independent

physician and disability examiner and concluded that the Plaintiff was not disabled at any time through December 31, 1997, her date last insured (DLI). (R. 36).

The Plaintiff requested a hearing and one was held before an administrative law judge (ALJ) on June 28, 2000. (R. 565-70). The ALJ vacated the unfavorable reconsideration determination and remanded the case to the state agency for further development and consideration of the Plaintiff's mental impairment claim. (R. 48). On May 3, 2001, the state agency again reached an unfavorable decision. (R. 51). The Plaintiff requested a hearing and one was held on May 2, 2003. (R. 574). On May 29, 2003, the ALJ issued an unfavorable decision. The Appeals Council denied the Plaintiff's subsequent request for review, making the ALJ's decision the final decision of the Commissioner. (R. 18, 9-12). 42 U.S.C. § 405(g) (2005). That decision is the subject of this appeal.

In compliance with the Procedural Order issued in this matter, the parties have filed briefs in support of their respective positions. (Docs. 12 & 14).

## II. STANDARD OF REVIEW.

When reviewing the denial of disability benefits, we must determine whether the denial is supported by substantial evidence. *Brown v. Bowen*, 845 F.2d 1211, 1213 (3rd Cir. 1988); *Mason v. Shalala*, 994 F.2d 1058 (3rd Cir. 1993). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552 (1988); *Hartranft v. Apfel*, 181 F.3d 358, 360. (3d Cir. 1999). It is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

To receive disability benefits, the Plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

### III.  ELIGIBILITY EVALUATION PROCESS.

A five-step evaluation process is used to determine if a person is eligible for disability benefits.  *See* 20 C.F.R. § 404.1520 (2004).  *See also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999).  If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed any further.  20 C.F.R. § 404.1520.

The first step of the process requires the Plaintiff to establish that she has not engaged in "substantial gainful activity."  20 C.F.R. § 404.1520(b).  The second step involves an evaluation of whether the Plaintiff has a severe impairment.   *See* 20 C.F.R. § 404.1520(c). The Commissioner must then determine whether the Plaintiff's impairment or combination of impairments meets or equals those listed in Appendix 1, Subpart P, Regulations No.4.  20 C.F.R. § 404.1520(d).

If it is determined that the Plaintiff's impairment does not meet or equal a listed impairment, the Commissioner must continue with the sequential evaluation process and consider whether the Plaintiff establishes that she is unable to perform her past relevant work. 20 C.F.R. §§404.1520(e)-(f). The Plaintiff bears the burden of demonstrating an inability to return to her past relevant work. *Plummer*, 186 F.3d at 428. Then the burden of proceeding shifts to the Commissioner to demonstrate that other jobs exist in significant numbers in the national economy that the Plaintiff is able to perform, consistent with her medically determinable impairments, functional limitations, age, education and work experience. 20 C.F.R. §§ 404.1520(g), 404.1560(c). This is Step Five, and at this step, the Commissioner is to consider the Plaintiff's stated vocational factors. *Id*.

Here, the ALJ proceeded through each step of the sequential evaluation process and concluded that the Plaintiff was not disabled within the meaning of the Act at any time after her alleged disability onset date of November 25, 1996 through her DLI of December 31, 1997.[1] (R. 20-25). At step one, the ALJ found that the Plaintiff had not engaged in substantial gainful work activity since her alleged disability onset date. (R. 21). At steps two and three, the ALJ concluded that the Plaintiff's discogenic and degenerative back disorders were severe within the meaning of the Regulations, but not severe enough, either singly or in combination, to meet or equal the criteria for establishing disability under the listed impairments as set forth in Appendix 1, Subpart P, Regulations No. 4. (R. 21-22). The ALJ found that the Plaintiff's affective disorders were not severe

---

[1] For purposes of the Plaintiff's DIB application, her insured status expired as of December 31, 1997. (R. 20-25). Accordingly, the Plaintiff need to show that she was disabled as of December 31, 1997 in order to receive DIB. 20 C.F.R. §§ 404.101(a), 131(a).

under the Regulations. (R. 22). At step four, the ALJ found that the Plaintiff was able to perform her past relevant work as a nurse's aide, waitress, or sewer. (R. 24). Accordingly, the ALJ's decision rested at step four, and the Plaintiff was found to be not disabled within the meaning of the Act. (R. 20). 20 C.F.R. § 404.1520(f).

## IV. DISCUSSION.

### *A. Background*

The Plaintiff, forty-seven-years-old at the time her insured status expired, was considered a younger individual under the Regulations. (R. 579, 24). 20 C.F.R. § 404.1563(c). She has an eighth-grade education and past work experience as a nurse's aide, waitress, and sewer. (R. 128). The Plaintiff alleged disability since November 25, 1996, the date she stopped working as a nurse's aide. (R. 128-29).

The Plaintiff strained her low back while lifting a patient in January1991. (R. 303). She underwent six weeks of physical therapy with good results and was released to light duty work. (R. 296). She returned to her former home nursing occupation in June 1995, and continued to work until November 1996. (R. 110, 128-29). The Plaintiff also has a history of episodic neck pain related to domestic violence injuries. (R. 21, 208).

The Plaintiff stopped working in November 1996, allegedly due to headaches, tiredness, and constant pain in her neck and back. (R. 128, 176). An April 1998 MRI showed herniated disc at C4-5 without spinal cord compression and degenerative disc disease at C5-6. (R. 208). The Plaintiff underwent cervical disc surgery in April 1998. (R. 203). She had no postoperative relief and in June 1998 underwent further cervical fusion. (R. 203, 337-38). In September 1998, the Plaintiff

complained of headaches, but her neurological examination was normal. (R. 191-92). Prasad Ancha, M.D., a neurologist, noted that the Plaintiff complained of diffuse body pains and thought that her symptoms suggested arthritis. (R. 192). Dr. Ancha also noted that the Plaintiff had been treated for depression and that she did not appear depressed at the time. (R. 191-92). In October 1998, Dr. Ludivico, a hematologist, noted that the Plaintiff had trigger points characteristic of fibromyalgia. (R. 521).

The Plaintiff complained of pain in her neck and the back of her head to Bruce Northrup, M.D., in July 1999. (R. 334). Dr. Northup ordered MRI's of the Plaintiff's lumbar and cervical spine, which showed, in the lumbar spine, moderate degenerative spondylosis and posterior bulging at L5-S1 but no evidence of disc herniation or spinal stenosis and, in the cervical spine, a flattened cervical lordosis, post-surgical changes attributed to artifactual blooming of the surgical screws, and no disc herniation. (R. 334, 321-22). Dr. Northrup removed the surgical screws in December 1999. (R. 335-36). In January 2000, Dr. Northrup stated that although the Plaintiff complained of substantial pain in her neck, he stressed to her that she had a good surgical outcome and that she should improve over several months. (R. 331-32).

Robert Mauthe, M.D., met the Plaintiff in March 2000 and opined that she was in constant pain. (R. 338). Dr. Mauthe noted, however, that because he had never treated the Plaintiff before, he could not comment on her medical condition before March 2000. (R. 337). He did opine, however, in a letter seeking deferral of the Plaintiff's student loans, that the Plaintiff was disabled from March 2, 2000 onward. (R. 337).

The Plaintiff also has a history of mental health problems that predates her physical problems. (R. 278). The Plaintiff began seeing Tom Williams, M.D., a psychiatrist, in 1988 for severe depression. (R. 277). Between 1988 and 1992, the Plaintiff was hospitalized five times for symptoms of anxiety and depression, all of which were precipitated by either suicidal gestures or attempts. (R. 22, 278-79, 242-43, 532, 583-84). The Plaintiff saw Dr. Williams more frequently during 1990, when she was ending a troubled marriage. (R. 277).

The Plaintiff began seeing Eric D. Becker, M.D., a psychiatrist, in April 1995 for major depression. (R. 341, 500). Dr. Becker reported that the Plaintiff had a twelve-year history of major depression and that it became evident to him, as he continued to treat her, that she also had a panic disorder. *Id.* Dr. Becker also reported that the Plaintiff did well with treatment, having only periodic episodes of panic, and was watching an elderly woman.[2] (R. 500). The Plaintiff remained mostly stable until she began having increased problems with head and back pain in September 1998. *Id.*

The Plaintiff was hospitalized for four days in July 2000 for major depression. (R. 396). She was again admitted to the hospital in September 2000 for depression. (R. 500). Dr. Becker diagnosed bipolar disorder, mixed, in addition to panic disorder, and prescribed medications accordingly. (R. 342, 500). Dr. Becker also stated that the medications he gave her could be sedating and therefore impact her the Plaintiff's ability to work. (R. 500). He further opined that her physical and emotional difficulties would make gainful work very difficult. *Id.*

---

[2] The Commissioner mischaracterizes Dr. Becker's notation that the Plaintiff "was watching an elderly woman" by stating that Dr. Becker said the Plaintiff "was able to care for an elderly woman." (Doc. No. 14 at 2). The Plaintiff testified that her husband and visiting nurses did most of the care for the woman, who was the Plaintiff's husband's grandmother. (R. 596-97).

Donna Winter, Ph.D., a psychologist, evaluated the Plaintiff's medical records for the state agency in February 2001, and concluded that the Plaintiff's mental impairments were severe, but not consecutive for the twelve months prior to the Plaintiff's DLI.  (R. 502-04).

Cindi Hill, M.D., in April 2001 evaluated the Plaintiff's medical records for the state agency and concluded that the Plaintiff had the residual functional capacity (RFC) to occasionally lift twenty pounds, frequently lift ten pounds, stand or walk about six hours in a an eight-hour workday, and unlimited ability to push or pull.  (R. 520).

The Plaintiff contends that the ALJ erred in: (1) not discussing whether the Plaintiff's fibromyalgia was a severe impairment; (2) not finding the Plaintiff's mental impairments to be severe impairments; (3) not addressing the Plaintiff's credibility, and; (4) not considering her mental impairments when determining her residual functional capacity.

***B. Whether the ALJ erred in not discussing the Plaintiff 's alleged impairment of fibromyalgia***

The Plaintiff first argues that the ALJ erred in not addressing the issue of whether her fibromyalgia was a severe impairment, stressing that she alleged fibromyalgia as an impairment in her February 1999 DIB application and a reference to it appears in several places in the record. (Doc. No. 12 at 7).  Other than the Plaintiff's application or related reports, however, reference to fibromyalgia appears only in Dr. Mauthe's March 2000 letter, two RFC assessment from non-examining state agency physicians, one of which was citing an October 1998 report by Dr. Ludivico that the Plaintiff had trigger points characteristic of fibromyalgia, and Dr. Ludivico's report itself.  (R. 323, 521, 208-14).

The ALJ did not mention fibromyalgia in his decision. (R. 20-25). The ALJ's decision focused, however, on the time period between November 1996, that date the Plaintiff last worked, and December 31, 1997, the Plaintiff's DLI. (R. 20). It appears that any diagnosis of fibromyalgia was not made until well after December 1997, at least until October 1998 when Dr. Ludivico noted that the Plaintiff had trigger points characteristic of fibromyalgia . (R. 521). At approximately the same time, however, Dr. Ancha opined that the Plaintiff's pain symptoms represented arthritis, not fibromyalgia. (R. 192).

While it is true, as the Plaintiff's points out, that retrospective diagnosis of an impairment can support of finding of past impairment, there must be lay evidence of that impairment relating back to the claimed period of disability. *Newell v. Commissioner*, 347 F.2d 541, 547 (3d Circ. 2003). Even aside from the issue of the timing of the fibromyalgia diagnosis, there is substantial evidence that the Plaintiff's pain symptoms did not worsen until after the relevant period.

In fact, the medical record seems to suggest a timeline beginning in January 1998. The ALJ noted that Dr. Northrup's report indicated that the Plaintiff's pain began in approximately January 1998, and that although the Plaintiff's chiropractor, Dr. Kulik, had seen the Plaintiff for pain complaints in June 1997, he had observed normal cervical and lumbar motion. (R. 23, 334, 190). The Plaintiff complained to her physicians of severe neck pain in April 1998, after which she had two consecutive cervical surgeries. (R. 199-207). Dr. Becker reported that the Plaintiff experienced an increase in neck and spine pain in September 1998, which the Plaintiff attributed to her two surgeries. (R. 500). Indeed, the record indicates that the Plaintiff called her physicians complaining

of pain in October 1998.  (R. 200).  It was also in October 1998 that Dr. Ludivico opined that the Plaintiff had trigger points characteristic of fibromyalgia.  (R. 521).

At any rate, while the ALJ did not specifically mention fibromyalgia, he did not fail to discuss whether fibromyalgia symptoms affected the Plaintiff's ability to work.  The ALJ acknowledged that Plaintiff had alleged disability due to "chronic pain and fatigue," the symptoms of fibromyalgia.  (R. 23).  FIBROMYALGIA, at  http://www.mayoclinic.com/health/fibromyalgia/DS00079.

### C. Whether substantial evidence supports the ALJ's finding that the Plaintiff 's mental impairments were not severe during the period under review

The Plaintiff's second argument challenges the ALJ's determination that the Plaintiff did not have a severe mental impairment.  Here again, the relevant time period was a crucial factor.  The record reveals that the Plaintiff's treatment and symptoms waxed and waned over the years.  Unfortunately for the Plaintiff, one of the times they waned was during the period under review.  This is not a situation where the Plaintiff's physicians failed to diagnose or recognize the existence of mental impairments during the relevant period.  *Newell*, 347 F.2d at 547-48.  As the Commissioner notes, contrary to the Plaintiff's assertions, the record is not vague.  (Doc. No. 14 at 3; Doc. No. 12 at 4).  Dr. Becker's letter to the Bureau of Disability Determination in particular makes clear that, after he began treating her in 1995, the Plaintiff's mental impairments improved and were stable until September 1998.  (R. 500).  This was the state agency psychologist Dr. Winter's conclusion as well.  (R. 502-04).

The Plaintiff was hospitalized for severe depression several times, but never during the period under review.  Indeed, after five hospitalizations for psychiatric treatment in the early 1990s, the

Plaintiff returned to work in June 1995, and continued to work until November 1996. (R. 110, 128-29). Because the record contains no treating physician or psychologist opinion during the period at issue, it was appropriate for the ALJ to rely upon the opinion of Dr. Winter, the state agency psychologist who reviewed the record. (R. 504-17). It is, after all, the burden of the Plaintiff, who is "in a better position to provide information," to show a disability. *Bowen v. Yuckert*, 482 U.S. 137, 147 (1987). While Plaintiff asserts that Dr. Becker's statement that she was "stable" does not necessarily mean that she could work (Pl. Br. 11-12), neither is Dr. Becker's statement an opinion of disability.

### ***D. Whether the ALJ erred in finding the Plaintiff not fully credible regarding her limitations***

The Plaintiff's third argument is that the ALJ erred in evaluating her subjective complaints and credibility. Contrary to the Plaintiff's assertion, the ALJ did discuss her credibility and determined that the Plaintiff was not fully credible regarding her limitations. (R. 23, 24). The ALJ concluded that although the Plaintiff alleged complete inability to perform substantial gainful activity due to chronic pain and fatigue, the medical records for the period under review did not bear out her claim. (R. 23).

While the record in this case is more than 600 pages, as the Plaintiff observes, much of the medical record significantly pre-dates and post-dates the relevant period of November 1996 to December 31, 1997. (Doc. No. 12 at 18). Of course, "[a]n ALJ must give serious consideration to a claimant's subjective complaints of pain, even where those complaints are not supported by objective evidence." *Ferguson v. Schweiker,* 765 F.2d 31, 37 (3d Cir.1985). Yet subjective

complaints, without more, do not in themselves constitute a disability. *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984). The ALJ noted that the Plaintiff's hearing testimony in July 2000 focused more on her functional limitations at that time, rather than her limitations during the period. under review.[3] (R. 23). To the extent that the Plaintiff did testify about her symptoms from the relevant time period, the ALJ found that the Plaintiff's alleged limitations simply were not documented during the relevant time period. (R. 23, 590-95).

It is true, as the Plaintiff points out, that the ALJ listed the relevant factors to be considered in assessing credibility, and then failed to discuss the application of the facts to each of them. (R. 23; Doc. No. 12 at 14). Social Security Regulation (SSR) 96-7p. While we find such a bare minimum treatment of the relevant factors, by listing them and moving on, to be unsatisfactory and unhelpful for our review, we also find that substantial evidence supports the ALJ's ultimate credibility finding, which is what matters for our purposes. *Mason*, 994 F.2d at 1064.

### *E. Whether the ALJ erred in determining the Plaintiff's RFC*

The Plaintiff's last argument is that the ALJ did not discuss the Plaintiff's alleged mental impairments when determining her RFC. As the Plaintiff correctly notes, even if an ALJ determines that an impairment is not severe at step two of the sequential evaluation, it can still factor into the Plaintiff's RFC. SSR 96-8p. The Regulations instruct:

---

[3] The ALJ's finding that the Plaintiff's testimony centered on her abilities as of July 2000 and were therefore not relevant to determining her functional limitations as of 1997 disproves the Plaintiff's contention that the ALJ conducted a "sit and squirm" test to evaluate the credibility of the Plaintiff's allegations of pain. (R. 23; (Doc. No. 12 at 16-17). If the ALJ had in fact been relying on his observations of the Plaintiff during the hearing to make a lay determination about her condition, he would not have found those observations irrelevant to the time period at issue. *Van Horn v. Schweiker*, 717 F.2d 871, 874 (3d. Cir. 1983).

> In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe." While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may-- when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim.

SSR 96-8p at 1996 WL 374184, *5. As previously discussed, the ALJ decided at step two that the Plaintiff's depression and panic disorder were not severe impairments. (R. 22).

Here, it appears that the ALJ focused only on the Plaintiff's physical impairments when determining the Plaintiff's RFC. (R. 23-24). The ALJ relied on the physical RFC assessment from Dr. Hill and on the Plaintiff's description of the physical demands of her past relevant work in a factory in determining the Plaintiff's RFC. (R. 23, 518-25, 129). While the ALJ did mention earlier in his decision that while the Plaintiff's mental impairments resulted in no "more than slight functional limitations" during the period under review, the ALJ did not discuss what those limitations were. (R. 22, 23-24). This brief mention does not satisfy the demands of SSR 96-8p.

This failure to evaluate the Plaintiff's mental RFC is particularly troubling given that the case was previously remanded to the state agency for the purpose of developing the Plaintiff's mental impairment history. (R. 48-49). Dr. Winter was specifically asked to assess the Plaintiff's mental RFC, something she did not do.[4] (R. 502, 504, 514-15). While we concede that it is possible that Dr. Winter did not assess the Plaintiff's mental RFC for the period under review because the

---

[4] The Commissioner does not put forth much of a counter-argument to the Plaintiff's contention that the ALJ ignored SSR 96-8p, noting that the ALJ could have relied on Dr. Winter's evaluation. (Doc. No. 14 at 11). Dr. Winter's evaluation, however, did not offer an opinion regarding the Plaintiff's mental RFC. (R. 502-17).

record did not contain relevant medical evidence for that period of time, we note that Dr. Winter was asked to do so, and that SSR 96-8p obligated the ALJ to consider the Plaintiff's mental RFC.

**V. RECOMMENDATION.**

Based on the foregoing, it is respectfully recommended that the Plaintiff's appeal be **REMANDED** in order to determine the Plaintiff's mental residual functional capacity and resulting limitations.

**s/ Thomas M. Blewitt**
**THOMAS M. BLEWITT**
**United States Magistrate Judge**

**Dated: April 12, 2006**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOANNE M. MECKLEY | : | CIVIL ACTION NO. **3:CV-05-1031** |
| Plaintiff | : | (Judge Conner) |
| v. | : | (Magistrate Judge Blewitt) |
| JOANNE B. BARNHART, Commissioner of Social Security, | : | |
| Defendant | : | |

## **NOTICE**

**NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing

**Report and Recommendation** dated **April 12, 2006.**

Any party may obtain a review of the Report and Recommendation pursuant to Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within ten (10) days after being served with a copy thereof.  Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The briefing

requirements set forth in Local Rule 72.2 shall apply.  A judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record.  The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

                                       **s/ Thomas M. Blewitt**
                                       **THOMAS M. BLEWITT**
                                       **United States Magistrate Judge**

**Dated: April 12, 2006**